# EXHIBIT 1

ELECTRONICALLY FILED
5/4/2021 11:21 AM
57-CV-2021-900077.00
CIRCUIT COURT OF
RUSSELL COUNTY, ALABAMA
JODY SELLERS, CLERK

## IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

| | |
|---|---|
| **CITY OF PHENIX CITY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO:** |
| ) | <u>57-CV-2021-900077.00</u> |
| **MASTER METER, INC.; EMPIRE** ) | |
| **PIPE & SUPPLY COMPANY, INC.;** ) | |
| **CENTRAL PLANT TECHNOLOGY,** ) | ***TRIAL BY JURY REQUESTED*** |
| **INC.; and FICTITIOUS DEFENDANTS** ) | |
| **A-J, those persons, corporations,** ) | |
| **partnerships or entities who acted either** ) | |
| **as principal or agent, for or in concert** ) | |
| **with the other named Defendants and/or** ) | |
| **whose acts caused or contributed to the** ) | |
| **damages sustained by the Plaintiff,** ) | |
| **whose identities are unknown to the** ) | |
| **Plaintiff, but which will be substituted** ) | |
| **by amendment when ascertained,** ) | |
| ) | |
| **Defendants.** ) | |

## AMENDED COMPLAINT

Plaintiff, City of Phenix City (the "City" or "Plaintiff"), brings this Amended Complaint against Defendants Master Meter, Inc. ("Master Meter"); Empire Pipe & Supply Company, Inc. ("Empire Pipe"); Central Plant Technology, Inc. ("Central"); and other Fictitious Defendants A-J (collectively, the "Defendants") and alleges the following:

## STATEMENT OF THE CASE

1.  This lawsuit arises out of the purchase, installation, substandard replacement, and eventual complete failure of electronic water meter registers ("registers") designed, manufactured, and sold by Defendant Master Meter and marketed and installed by Defendants Empire Pipe and Central.

2.    Plaintiff operates the Department of Public Utilities which provides water and sewage services throughout the City. Plaintiff has been, and continues to be, damaged due to the negligent, reckless, willful, and wanton conduct of the Defendants which contracted or subcontracted with Plaintiff to install an Automated Meter Reading ("AMR") System or manufactured equipment including the registers to be used in conjunction with the AMR System which has malfunctioned and caused Plaintiffs to incur monetary damages.

3.    Upon information and belief, each of the Defendants were acting as the agents, servants, and employees of each other and in doing the actions alleged herein were acting within the scope of their authority and with the permission and consent, either express or implied of each of the other Defendants.

4.    As a direct and proximate result of Named and Fictitious Defendants' acts and omissions, Plaintiff has suffered substantial economic and consequential damages, including, but not limited to, (1) the $3,102,937.40 paid to Defendants in connection with the Purchase and Installation Contract; (2) lost revenue; and (3) investigation, remediation, and repair costs including labor costs incurred to replace the defective registers.

5.    Wherefore, Plaintiff seeks compensatory, consequential, incidental, and punitive damages to the fullest extent allowed by award from a jury.

### JURISDICTION & VENUE

6.    Jurisdiction is proper in this Court pursuant to ALA. CODE §12-11-30(1), as Plaintiff's claims exceed $10,000.

7.    Venue is proper in this Court pursuant to ALA. CODE § 6-3-7(a)(1) because Russell County is where a substantial part of the events or omissions giving rise to the alleged conduct occurred. Venue is also proper pursuant to ALA. CODE § 6-3-7(a)(3) because it is the County where

Plaintiff has its principal office in this State and Defendants conduct business by agent in Russell County.

8.      Plaintiff asserts no federal cause of action in this Amended Complaint.

## PARTIES

9.      Plaintiff is a domestic municipal corporation formed pursuant to ALA. CODE §11-40-1 and is located in Russell County, Alabama.  It is authorized to establish and operate a waterworks for its residents pursuant to ALA. CODE § 11-50-1.1.

10.     Defendant Master Meter, Inc. is a foreign corporation qualified to do business in the State of Alabama, and is causing injury in Russell County, Alabama. Master Meter's principal address is 101 Regency Parkway, Mansfield, Texas 76063.  Master Meter's registered agent in Alabama, Corporation Service Company, Inc. is located 641 South Lawrence Street, Montgomery, Alabama 36104.

11.     Defendant Empire Pipe & Supply Company, Inc. is a domestic corporation with its principal place of business located at 2301 Alton Road, Birmingham, Alabama, 35210, and is causing injury in Russell County, Alabama.  Empire Pipe's registered agent, Jack P. Stephenson, Jr., is located at 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203.

12.     Defendant Central Plant Technology, Inc., is a domestic corporation with its principal place of business located at 3010 Decatur Road, Cottonwood, Alabama, 36320 and is causing injury in Russell County, Alabama.  Central's registered agent, Pat Bradley, is located at Route 2, Box 432, Headland, Alabama 36345.

13.     Fictitious Defendants A, B, C, D, E, F, G, H, I, & J are those persons, corporations, partnerships, or entities who acted either as principal or agent, for or in concert with the named Defendants, and/or whose acts caused or contributed to the damages sustained by the Plaintiff,

whose identities are unknown to Plaintiff, but which will be substituted by amendment when ascertained.

## FACTUAL ALLEGATIONS

14.     Plaintiff operates the Department of Public Utilities which provides water and sewage services to approximately 14,513 customers in Phenix City, Alabama.

15.     In or around 2009, Plaintiff decided to upgrade its water meter infrastructure to AMR technology to reduce the time and cost of manually reading water meters, improve its billing accuracy and efficiency, reduce water losses, and save money.  Equipment manufactured by Defendant Master Meter was considered for that purpose.

16.     In or around February 2010, April 2010, and June 2010, Plaintiff and representatives from Defendants Master Meter and/or Empire Pipe met on three occasions to discuss their joint proposal to sell and install AMR technology manufactured by Defendant Master Meter.  Upon information and belief, Defendant Empire Pipe is the local supplier of Defendant Master Meter's water meters in the State of Alabama.

17.     The proposals provided a detailed overview of the specifications of the water meters, their component parts manufactured by Defendant Master Meter, and the accompanying AMR drive-by technology which transmitted the volume of water consumed by a customer via radio signal to a water utility employee driving by in a vehicle.  The primary advantage of AMR technology is that a water utility employee did not have to leave their vehicle to manually check a water meter to record a customer's consumption.

18.     The materials distributed during the presentations expressly represented the benefits of Defendant Master Meter's AMR system.  These representations include, but are not limited to, the following:

    a.  A 20-year "sustained accuracy warranty" for Master Meters' Multi-Jet water meter technology which equaled "**20 YEAR** Revenue Protection."

    b.  A 3G® Operations AMR system that would electronically transmit a meter reading every 11 seconds to the laptop of a water utility employee driving by. The design stated that the hermetically enclosed electronics would prevent moisture intrusion resulting in "less failure and increased reliability."

    c.  The 3G® AMR Features include, among other things, a "Warranty Advantage" that would "give you 20 years of electronics protection on your investment in the Master Meter AMR product." The warranty itself was also provided and stated that "Master Meter will repair or replace the product, at Master Meter's sole option, at no charge to the customer, subject to the terms of the warranty."

    d.  The City could retrofit existing water meters with Defendant Master Meter's 3G® Interpreter™ Register which offers all the benefits associated with AMR technology.

19.    On August 3, 2010, Plaintiff and Defendant Empire Pipe entered into the Purchase and Installation Contract ("Contract") for the sale and installation of Defendant Master Meter's AMR System. The total project cost was $3,102,937.40 and included new water meter registers to be installed on either existing water meters manufactured by Neptune or new water meters manufactured by Defendant Master Meter, new Multi-Jet water meters of varying sizes, software/training, and computer and reading equipment. A copy of the Contract is attached hereto as Exhibit A.

20.    Section 5 of the Contract required Defendant Empire Pipe to subcontract the installation of the purchased items to a general contractor in accordance with the specifications set forth in the Contract. Defendant Empire Pipe hired Defendant Central to install the items purchased by Plaintiff.

21.    The Contract incorporated two warranties provided by Defendant Master Meter that were included in the proposals. The "Multi-Jet Meter Warranty" provided a two-year materials and workmanship warranty for various sized water meters that were purchased. The "DIALOG®

3G-DS Component Warranty" ("Component Warranty") provided a 10-year materials and workmanship warranty to replace or repair a defective register at no cost to Plaintiff and a prorated replacement cost for another 10-year period.   Defendant Master Meter's breach and/or failure to fulfill the terms of its "DIALOG® 3G-DS Component Warranty" gives rise to this Amended Complaint.

22.   On August 17, 2010, Defendant Central emailed Plaintiff's representatives to plan the installation of the water meters and component parts.

23.   On or about August 29, 2011, Plaintiff's representatives and Jeremy Wells from Defendant Empire Pipe met to "discuss the high volume of meter change out request[s] and the high volume of meters that are unable to be radio read" which were problematic "cycle after cycle, month after month." These failures forced Plaintiff to send its technicians into the field to "manually get reads which also ultimately prevent[ed] delays in the bill run process."   Wells "agreed to order what [was] necessary 'at no cost to the city' to 'cleanup & resolve' the current meter change out issues."

24.   Between November 2016 and April 2017, approximately 978 of Plaintiff's 14,131 registers (a 7% failure rate) malfunctioned for an unknown reason and had to be replaced.

25.   On or around April 18, 2017, representatives from Defendants Master Meter and Empire Pipe met with Plaintiff to discuss the increasing number of registers that were failing, the potential causes of the failures, and how to address them under the Component Warranty. Defendant Master Meter and Empire Pipe representatives informed Plaintiff they were trying to keep up with the number of replacement registers required for all of Plaintiff's AMR system to return to full operation.   Defendant Master Meter and Empire Pipe representatives stated that Defendant Master Meter's standard replacement process under the Component Warranty, known

as "Requested Materials Authorized," would take time before Plaintiff would receive all the registers needed to replace its defective registers because Defendant Master Meter would have to analyze the registers returned by Plaintiff to confirm they were defective prior to shipping new registers. Instead, they recommended that Plaintiff submit a credit application and submit purchase orders to expedite the replacement additional registers that would be "cross-shipped." This deviation from the Component Warranty was designed to permit Defendant Master Meter to ship new registers to Plaintiff "on loan" and required Plaintiff to send the defective registers to Defendant Master Meter for inspection.

26.     During this meeting, Defendants Master Meter and Empire Pipe represented that they were unaware of the reason(s) causing the cumulative failure of Plaintiff's registers and that Plaintiff would not owe any labor costs to replace the registers.

27.     On multiple occasions over the course of a few years, Plaintiff continually reported its concerns about the increasing number of defective registers to Defendants Empire Contract and Master Meter and informed that their efforts to replace those registers as required by the Component Warranty were insufficient.   These failures rendered the Component Warranty ineffective.

28.     On August 24, 2017, Phenix City Utilities Engineer John Spraggins requested that Defendant Master Meter send its employees or those from Defendant Empire Pipe to replace registers that were not reading remotely and sought a meeting to discuss its meter issues.

29.     On or around September 22, 2017, Defendant Empire Pipe representative Jeremy Wells spoke with Plaintiff's representatives to inform he scheduled two technicians to replace approximately 1,000 defective registers.   Upon information and belief, Wells stated that the number of defective registers was "too high" and that he would have to "jump through hoops" to

force Defendant Master Meter to send enough technicians to replace the growing number of registers that had failed.

30.     On our around, September 25, 2017, Wells met with Plaintiff's representatives to discuss the City's ongoing issues with the increasing number of failing registers which doubled from approximately 600 to 1,200 over the previous three months. Wells informed that two other water utilities that purchased the same registers around the same time as Plaintiff in 2010 suffered from a 16% failure rate which prompted Defendant Master Meter to replace all their registers, but he was still uncertain what caused those failures. Wells also informed that Plaintiff's failure rate would have to double from its current 8% to warrant the entire replacement of registers. Until that happened, Wells recommended that Plaintiff continue requesting replacement registers as they failed.

31.     On October 23, 2017, Plaintiff's Meter Reader Supervisor Jason Franklin emailed Defendant Master Meter's Customer Focus Coordinator Clint Lake that the City's "failure rate with registers is increasing" and noted that its replacement of those registers was not keeping up with the high number of failures. These failures pulled Plaintiff's technicians away from their other standard daily duties and resulted in Plaintiff paying them overtime to also manually read the increasing number of meter registers that failed.

32.     On December 4, 2017, Franklin again informed Lake the register replacements were not moving quickly enough and that the City needed help sooner than could be provided. Franklin informed that using City employees to replace the registers was "quite the challenge" because they became "consumed with reading skipped meters" as Plaintiff was "not staffed to manually read [its] meters and [the employees] are constantly behind." Despite Franklin's pleas to send help sooner, Lake could not until January 8, 2018.

33.     On January 10, 2018, Franklin again informed Lake that the City was "not making any progress" in changing out the registers due to "the rate that the registers are going out." He requested that Defendant Master Meter "come to fix the problem and stay until everything is complete."

34.     On January 12, 2018, Plaintiff's Assistant City Manager and Director of Utilities Stephen Smith informed Lake that the register failures had "gotten worse and worse, and it is causing the City to expend substantial overtime, and numerous complaints for [its] citizens." Smith requested that Master Meter address the issue "completely (not piecemeal) ASAP."

35.     On March 26, 2018, Smith sent a letter to Defendant Master Meter informing that more than "one-third of the registers in [its] system had failed" and that the City had been "experiencing continuing failure of the registers on its water meters throughout the City for more than a year." Smith further stated that the "existing registers are continuing to fail at an accelerating rate and it is evident that the entire inventory of registers will have failed over the next few months...The system wide failure of the registers has cost the city tens of thousands of dollars in overtime and lost revenue. These costs are continuing and growing." This letter also noted that Defendant Master Meter's warranty was ineffective because it was "designed to replace an[] occasional failure not the system wide failure" the City was experiencing and that it was "unreasonable to expect the City to continue to absorb the costs of replacing the registers given the extent of the failures."

36.     Defendant Master Meter subsequently analyzed Plaintiff's route files to determine the number of registers that may experience a premature failure due to what Plaintiff subsequently learned to be a software glitch resulting in the registers' batteries draining well before their anticipated 20-year lifespan represented in the Component Warranty.

37.     On August 21, 2018, Defendant Master Meter and Plaintiff entered into an agreement to address the register failures and registers that could prematurely fail whereby Defendant Master Meter agreed to replace "up to 9,410 registers at no charge and [Plaintiff would] receive a new 10-year full, 10-year prorated warranty." Defendant Master Meter agreed to ship up to 2,000 registers monthly until all 9,410 registers were replaced. This agreement did not reference which party was responsible for installing the new registers.

38.     On October 18, 2018, Plaintiff entered into a contract with River Bottom Investments, Inc. to replace 9,411 registers at $16 each for a total of $150,576. River Bottom Investments, Inc. eventually backed out of that contract which forced Plaintiff to use its own employees to replace the defective registers. In sum, Plaintiff paid River Bottom Investments, Inc. $81,728 for the portion of the contract it performed in replacing 5,108 registers.

39.     Between February 1, 2017 and August 31, 2020, Plaintiff replaced 12,403 of its 14,131 or 88% of its registers.

40.     During this time period and through the filing of this Amended Complaint, Plaintiff has incurred unanticipated labor costs to pay its employees to manually read water meters with defective registers and to replace defective registers. These labor costs include overtime because Plaintiff's employees had to complete these functions in addition to their daily tasks.

41.     Upon information and belief, all Defendants knew the register failures were caused by a software glitch which drained the batteries well before their 20-year life expectancy, and all Defendants knew about this defect at the time the registers were sold to Plaintiff, installed, and replaced.

42.     The AMR System promised by Defendants and purchased by Plaintiff was never delivered. Instead of having a fully operational AMR System that was warranted to last for 20

years, Plaintiff has had to replace nearly all its registers, incurred additional labor costs from its employees having to manually read water meters, incurred additional labor costs to replace registers that Defendants knew were defective and would prematurely fail, and incurred other damages to replace other defective registers which Defendants failed to provide under the Component Warranty.

43.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial economic and consequential damages, including, but not limited to, (1) the $3,102,937.40 paid to Defendants in connection with the Contract; (2) lost revenue; (3) and investigation, remediation, and repair costs including labor costs incurred to replace the malfunctioning equipment.

## COUNT ONE
### Fraud
### (Against Defendants Master Meter and Empire Pipe)

44.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

45.    Upon information and belief, Defendants Master Meter and Empire Pipe intentionally, willfully, and/or recklessly failed to disclose certain material facts that were known only to them and Plaintiff could not have discovered those facts. Specifically, Defendants Master Meter and Empire Pipe failed to disclose that the registers manufactured by Master Meter were defective and would not operate for the warranted 20-year lifespan. Defendants Master Meter and Empire Pipe also failed to disclose that the Component Warranty was ineffective in that it would not be able to sufficiently repair or replace a high number of defective registers needed for Plaintiff's AMR System to fully operate as warranted.

46.    Defendants Master Meter and Empire Pipe knew that Plaintiff's decision to enter into the Contract with them was to upgrade its water meter infrastructure to an AMR system that

would improve meter reading accuracy, meter reading time efficiency and cost, and eliminate the need to for its employees to manually read meters.

47.     These misrepresentations were material to Plaintiff's decision to enter into the Contract and were made or withheld to deceive and induce Plaintiff to enter into the Contract

48.     Plaintiff reasonably relied on Defendants Master Meter and Empire Pipe's intentional, willful, and/or reckless representations that the registers would function properly.

49.     Plaintiff also reasonably relied on Defendants Master Meter and Empire Pipe's intentional, willful, and/or reckless representation that Master Meter would honor its Component Warranty promising to "repair or replace" any defective registers to ensure the AMR System would fully operate as warranted.

50.     Plaintiff was not aware of, did not know, nor could have discovered, the concealed defects related to the registers or the inadequacy of the Component Warranty. Had Plaintiff known of those defects and the inadequacy of the Component Warranty, it would not have entered into the Contract with Defendants Master Meter and Empire Pipe. Thus, Plaintiff's consent to the Contract with Defendants is void due to these Defendants' fraud in inducing Plaintiff to enter into it and failure to disclose material facts.

51.     Plaintiff has been harmed as a direct and proximate result of Defendants Master Meter and Empire Pipe's fraud.   Their concealment of material facts was a substantial factor in causing Plaintiff's damages.

WHEREFORE   PREMISES   CONSIDERED,   Plaintiff   demands   judgment   for compensatory damages against Defendants Master Meter and Empire Pipe, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

**COUNT TWO**
**Fraudulent Suppression**
**(Against Defendants Master Meter and Empire Pipe)**

52.     Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

53.     Defendants Master Meter and Empire Pipe had a duty to disclose that the registers were defective, that the registers would not function for the entirety of the 20-year Component Warranty, and that the Component Warranty would be inadequate in the event that a large number of registers would fail. This duty arose from the contractual relationship among the parties.

54.     Upon information and belief, Defendants Master Meter and Empire Pipe intentionally, willfully, and/or recklessly failed to disclose, concealed, and/or suppressed certain material facts that were known only to them and Plaintiff could not have discovered. Specifically, Defendants Master Meter and Empire Pipe failed to disclose that the registers were defective and would not operate for the warranted 20-year lifespan. Defendants Master Meter and Empire Pipe also failed to disclose that their promises under the Component Warranty would not be able to sufficiently "repair or replace" all the registers purchased by Plaintiff in the event of a high rate of failure which ultimately occurred.  The Component Warranty was insufficient to cover the systemic failure encountered by Plaintiff which rendered it ineffective at maintaining a fully functioning AMR System.

55.     Defendants Master Meter and Empire Pipe knew that Plaintiff's decision to enter into the Contract was to upgrade its water meter infrastructure to an AMR system that would improve meter reading accuracy, meter reading time efficiency and cost, and eliminate the need for its employees to manually read meters.  Yet, they concealed and suppressed the defects which plagued Defendants Master Meter's registers and concealed or suppressed the fact its Component Warranty could not replace all defective electronic registers in the event of a high rate of failure.

56.     Plaintiff reasonably relied on Defendants Master Meter and Empire Pipe's intentional, willful, and/or reckless representations that the registers would function properly.

57.     Plaintiff also reasonably relied on Defendants Master Meter and Empire Pipe's intentional, willful, and/or reckless representation that Master Meter would honor its 20-year Component Warranty promising to "repair or replace" any defective registers to ensure its AMR System would fully operate as warranted.

58.     These misrepresentations were material to Plaintiff's decision to enter into the Contract and were made, or the truth was withheld, to deceive and induce Plaintiff to enter into the Contract.

59.     Plaintiff was not aware of, did not know, nor could have discovered, the concealed defects related to the registers or the inadequacy of the Component Warranty. Had Plaintiff known of those defects and the inadequacy of the Component Warranty, it would not have entered into the Contract with Defendants Master Meter and Empire Pipe.  Thus, Plaintiff's consent to the Contract with Defendants Master Meter and Empire Pipe is void due to their fraud in inducing Plaintiff to enter into it and their failure to disclose material facts to Plaintiff.

60.     Plaintiff has been harmed as a direct and proximate result of Defendants Master Meter and Empire Pipe fraud.  Their concealment of material facts was a substantial factor in causing Plaintiff's damages.

WHEREFORE   PREMISES   CONSIDERED,   Plaintiff   demands   judgment   for compensatory damages against Defendants Master Meter and Empire Pipe, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT THREE
### Negligent Misrepresentation
### (Against Defendants Master Meter and Empire Pipe)

61.     Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

62.     Upon information and belief, Defendants Master Meter and Empire Pipe misrepresented the quality, reliability, and operational life of the electronic registers.  Specifically, Defendants Master Meter and Empire Pipe represented the registers would last for 20 years and, if any register failed to perform as warranted, Master Meter would replace the defective register at no cost to Plaintiff.  However, in making these representations, Defendants Master Meter and Empire Pipe knew or had reason to know that they would not fulfill the obligations in the Component Warranty.

63.     Defendants Master Meter and Empire Pipe's misrepresentations were material to Plaintiff's decision to enter into the Contract.

64.     Defendants Master Meter and Empire Pipe's misrepresentations were made willfully to deceive Plaintiff, recklessly, without knowledge of their truthfulness, or mistakenly.

65.     Plaintiff reasonably relied on the representations made by Defendants Master Meter and Empire Pipe.

66.     The misrepresentations were negligent, in that Defendants Master Meter and Empire Pipe had no reasonable grounds for believing them to be true.  Instead, Defendants Master Meter and Empire Pipe knew, or should have known, that the registers were defective and that Master Meter would not be able to fulfill its obligations in the Component Warranty in the event a high number of registers failed and jeopardized the integrity of Plaintiff's AMR System.

67.     As a direct and proximate result of the breach and the AMR system failing to operate as represented, Plaintiff lost full use of the registers and was required to reallocate its

employees to manually those read meters which resulted in Plaintiff incurring in labor and installation costs to replace all the defective registers.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against Defendants Master Meter and Empire Pipe, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

### COUNT FOUR
### Breach of Express Warranty
### (Against Defendants Master Meter and Empire Pipe)

68.     Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

69.     In or around 2010, Plaintiff negotiated with Defendants Master Meter and Empire Pipe for the purchase and installation of water meters, component parts including electronic registers, and other equipment necessary for the operation of the AMR System.  In the course of negotiations, Defendants Master Meter and Empire Pipe touted and ultimately issued the Component Warranty whereby they agreed to preserve and maintain the utility and performance of the registers for their warranted lifespan.  As part of the Component Warranty, Defendant Master Meter agreed that it would, at its discretion, either replace or repair the electronic registers in the event they failed to perform as warranted.  Any registers that malfunctioned jeopardized the integrity of the AMR System to operate as represented.

70.     This express warranty that any defects would be rectified under the Component Warranty was made as part of the basis of the bargain.

71.     Over the course of several years, Plaintiff informed Defendants Master Meter and Empire Pipe that a significant number of its registers failed, that the existing registers were continuing to fail at an accelerating rate, and that it expected the entire inventory of registers to

fail in the near future. Plaintiff also informed Defendants Master Meter and Empire Pipe that their actions to fix these issues were insufficient for the AMR system to operate as intended.

72.    The actions taken by Defendants Master Meter and Empire Pipe under the Component Warranty were insufficient to repair or replace the defective registers and return Plaintiff's AMR system to fully operating as represented.

73.    Plaintiff performed all conditions required on its part in accordance with the Component Warranty. Plaintiff timely gave notice to Defendants Master Meter and Empire Pipe of said failures and defects within a reasonable time of discovery, yet Defendants Master Meter and Empire Pipe failed to repair or replace all the registers and return Plaintiff's AMR system to fully operating as represented as required by the Component Warranty.

74.    The Component Warranty failed of essential purpose which was to ensure that Plaintiff's AMR system functioned properly as represented by Defendants.

75.    As a direct and proximate result of the breach, Plaintiff was required to use employees to manually read and eventually replace defective registers which resulted in Plaintiff incurring in labor and installation costs.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against Defendants Master Meter and Empire Pipe, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT FIVE
### Breach of Implied Warranty of Merchantability
### (Against all Defendants)

76.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

77.     Upon information and belief, all Defendants are merchants with respect to the design, manufacture, sale, or installation of water meters and their component parts.

78.     Defendants Master Meter and Empire Pipe impliedly warranted by operation of law that the Master Meter registers were of merchantable quality.

79.     Defendants Empire Pipe and Central impliedly warranted they were capable of installing the AMR system and the registers and deliver the fully operational AMR system purchased by Plaintiff.

80.     Defendants breached the implied warranty of merchantability in that registers were not of merchantable quality and fit for its ordinary purpose for which registers were used, but in fact, completely failed well before their intended lifespan of 20 years.

81.     Plaintiff notified Defendants Master Meter and Empire Contract of said failures and defects within a reasonable time of discovery, yet Defendants Master Meter and Empire Contract failed to repair or replace the registers and return Plaintiff's AMR system to fully operating as represented as required by the Component Warranty.

82.     As a direct and proximate result of the breach, Plaintiff was required to use employees to manually read and eventually replace defective registers which resulted in Plaintiff incurring in labor and installation costs.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT SIX
### Breach of Implied Warranty of Fitness for a Particular Purpose
### (Against Defendants Master Meter and Empire Pipe)

83.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

84.    Plaintiff purchased the registers and the AMR system for the particular purpose of streamlining its collection of water consumption data and to save money.   Plaintiff expected the registers to be free of defects and perform for the entire 20-year time period and, in the event of a premature failure under the Component Warranty, Defendants Master Meter and Empire Pipe would repair and replace any defective registers to ensure Plaintiff's AMR system was fully operational.

85.    Upon information and belief, Defendants Master Meter and Empire Pipe knew or had reason to know that at the time of the purchase and installation of the registers, Plaintiff expected to use the registers for the entirety of their lifespan, and that such sufficient and reliable long-term performance of the registers was necessary for Plaintiff's AMR system to operate as intended and provide its water services to its customers.

86.    Upon information and belief, Defendants Master Meter and Empire Pipe knew or had reason to know that Plaintiff would rely upon the skill and judgment of Defendants Master Meter and Empire Pipe in the design, manufacture, and sale of said registers in providing registers fit for their particular purpose.

87.    Defendants Master Meter and Empire Pipe breached the implied warranty of fitness because the registers were not fit for said purpose, but in fact, failed well before its intended lifespan of 20 years.

88.    Plaintiff notified Defendants Master Meters and Empire Pipe of said failures and deficiencies within a reasonable time of discovery, yet Defendants Master Meters and Empire Pipe

failed to repair or replace all the registers and return Plaintiff's AMR system to fully operating as represented as required by the Component Warranty.

89.     As a direct and proximate result of the breach, Plaintiff was required to use employees to manually read and eventually replace defective registers which resulted in Plaintiff incurring in labor and installation costs.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against Defendants Master Meter and Empire Pipe, jointly and severally, in an amount to be determined by a struck jury in an amount in excess.

## COUNT SEVEN
### Breach of Contract
### (Against all Defendants)

90.     Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

91.     Defendants entered into a contract with Plaintiff promising to sell and install an AMR system with registers that that would streamline its collection of water consumption data by obviating the need to manually read water meters and save money.

92.     Plaintiff paid $3,102,937.40 pursuant to the Contract and performed its obligations required under the Contract and the Component Warranty to receive replacement registers that functioned properly.

93.     Defendants breached the Contract when they sold and installed an AMR system with registers that failed to function properly and negated the automatic transmission of water consumption data which was the key factor that induced Plaintiff to enter into the Contract. Defendants Master Meter also breached the Contract by failing to fulfill its duty under the Component Warranty which was to repair or replace the defective registers and return Plaintiff's AMR system to fully operating.

94.     As a direct and proximate result of the breach, Plaintiff was required to use employees to manually read and eventually replace defective registers which resulted in Plaintiff incurring in labor and installation costs.

95.     As a direct and proximate result of the breach, Plaintiff purchased an AMR system that was never delivered and is entitled to damages incurred including up to the $3,102,937.40 paid to Defendants in connection with the Contract.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## COUNT EIGHT
### Negligence
### (Against All Defendants)

96.     Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

97.     Defendants owed a legal duty to Plaintiff to exercise reasonable and due care in their design, sale, or installation of a functional AMR system that was purchased by Plaintiff.

98.     Defendant Master Meter owed a legal duty to Plaintiff set forth in the Component Warranty to repair and replace any defective registers and ensure the AMR system functioned properly.

99.     Defendants breached their duties owed to Plaintiff and, under the circumstances, Defendants' breaches constitute negligent, willful, and/or reckless conduct.

100.    As a direct and proximate result of the breach, Plaintiff was required to use employees to manually read and eventually replace defective registers which resulted in Plaintiff incurring in labor and installation costs.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

**<u>COUNT NINE</u>**
**Wantonness**
**(Against All Defendants)**

101.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

102.    Defendants owed a legal duty to Plaintiff to exercise reasonable and due care in their design and installation of a functional AMR system that was purchased by Plaintiff.

103.    Defendants Master Meter and Empire Pipe owed a legal duty to Plaintiff set forth in the Component Warranty to repair and replace any defective registers and ensure the AMR system functioned properly.

104.    In breaching the duties described above, Defendants acted in a wanton, willful, and reckless manner.

105.    Defendants knew or should have known of the danger to Plaintiff created by Defendants' conduct, practices, actions, and inactions.

106.    Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on Plaintiff.

107.    Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard for Plaintiff's operations.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all defendants, jointly and severally, in an amount to be determined

P.O. Box 4160
Montgomery, Alabama 36103
T: 334-269-2343
F: 334-954-7555

William J. Benton, Jr.
Benton & Benton
1214 Seventh Avenue
P.O. Box 2850
Phenix City, Alabama 36867
T: (334) 297-6534
F: (334) 297-8913

Jimmy Graham
The Graham Legal Firm
712 13th Street, Suite D
Phenix City, Alabama 36867

Attorneys for Plaintiff

by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

## **RELIEF DEMANDED**

Wherefore, Plaintiff respectfully requests this Court grant the following relief:

a)      Declare the Contract is void due the fraud perpetrated by Defendants Master Meter and Empire Pipe;

b)      Award Plaintiff all actual, consequential, incidental, and punitive damages resulting from the Defendants' breach of contract and tortious conduct in an amount to be proved at trial.

c)      Award attorney fees and costs and expenses incurred in connection with the litigation of this matter;

d)      Award such other and further relief as this Court may deem just, proper, and equitable.

## **JURY DEMAND**

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Dated: May 4, 2021.

Respectfully submitted,

  s/ Rhon E. Jones
JERE L. BEASLEY (BEA020)
Jere.Beasley@beasleyallen.com
RHON E. JONES (JON093)
Rhon.Jones@beasleyallen.com
J. RYAN KRAL (KRA016)
Ryan.Kral@beasleyallen.com
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

ELECTRONICALLY FILED
5/4/2021 11:21 AM
57-CV-2021-900077.00
CIRCUIT COURT OF
RUSSELL COUNTY, ALABAMA
JODY SELLERS, CLERK

# Exhibit A

## RESOLUTION NO. 2010-145

**WHEREAS,** on July 7,2010 the City Council of the City of Phenix City authorized the City Manager to negotiate a contract with Empire Pipe & Supply Company, Inc. to install an Automated Meter Reading System in the City of Phenix City, Alabama; and

**WHEREAS,** the attached proposed contract for this service is hereby submitted.

**NOW, THEREFORE, BE IT RESOLVED,** that the City Council of the City of Phenix City, Alabama authorizes the Mayor and City Manager to enter into the proposed contracts with Empire Pipe & Supply Company, Inc. to install an Automated Meter Reading System in the City of Phenix City.

**PASSED, APPROVED AND ADOPTED** this 3RD day of AUGUST , 2010.

_____
MAYOR

_____

_____

_____

ATTEST:

_____
CITY CLERK

_____
MEMBERS OF THE CITY COUNCIL OF
THE CITY OF PHENIX CITY, ALABAMA



BRADLEY ARANT
BOULT CUMMINGS
LLP

Kevin L. Turner
Direct: (205) 521-8209
Fax: (205) 488-6209
kturner@babc.com

July 27, 2010

<u>BY OVERNIGHT COURIER</u>

Mr. William Gregory Graham
The Graham Legal Firm
712 13th Street
Phenix City, Alabama 36868

Dear Mr. Graham,

Please find enclosed four copies of the Purchase and Installation Contract by and between Empire Pipe & Supply Company, Inc. and the City of Phenix City, Alabama, each containing the original signature of Mr. Cullom Walker on behalf of Empire Pipe & Supply Company, Inc. Following the approval and execution of the contract by Phenix City, please return two fully executed originals to my attention.

Please do not hesitate to contact me at (205) 521-8209 or kturner@babc.com should you have any questions.

Sincerely,

Kevin L. Turner

Enclosures

cc: James E. Rotch, Esq. (w/out enclosures)

## PURCHASE AND INSTALLATION CONTRACT
For the Sale and installation of a Radio Read Metering System (AMR)

This Purchase and Installation Contract (this "Agreement") is made and entered into by and between Empire Pipe & Supply Company, Inc., an Alabama corporation ("Seller"), and the City of Phenix City, Alabama ("Buyer") on or as of August 3RD, 2010.

RECITALS:

WHEREAS, on July 7, 2010, the City Council of Phenix City, Alabama. authorized and directed the Mayor and City Manager of the Buyer to enter into a contract with Seller based on Seller's qualifications for the purchase and installation of an automated meter reading system as more particularly described on Schedule 1 hereto (the "Systems"); and

WHEREAS, the parties desire to enter into said contract for the Systems on the terms and conditions contained
herein;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties, intending to be legally bound, agree as follows:

1.  Sale of Goods and Services. The terms and conditions of this Agreement govern in all respects the sale, purchase and installation of the Systems. Seller and Buyer shall operate under the terms of the proposal submitted to Buyer by Seller, a copy of which is attached hereto as Schedule 1. This Agreement supersedes any contrary provisions presented by Buyer, unless expressly agreed to in writing by Seller. Buyer agrees to purchase, and Seller agrees to sell and install, the Systems in the quantities and for the prices set forth on Schedule 1, and subject to all additional terms and conditions set forth herein. This Agreement governs the sale and installation of all Systems-related items hereafter purchased from Seller by Buyer, whether or not listed on Schedule 1 (the "Items"). Seller and Buyer acknowledge and agree that the quantities of Items set forth on Schedule 1 may be modified from time to time by the mutual written agreement of the parties, and this Agreement shall otherwise govern all such purchases and all other rights and liabilities of the parties to this Agreement.

2.  Prices. All prices for Items are set forth in Schedule 1 and are F.O.B. point. of delivery.

3.  Payments.   Seller shall invoice Buyer separately for (i) the sales costs of the items as reflected in the "Material" column of Schedule 1 (the "Material Costs") and (ii) the installation costs of the Items as reflected in the "Labor" column of Schedule 1 (the "Labor Costs"). Seller shall invoice Buyer for the Material Costs upon delivery of Items to the Buyer. Seller shall invoice Buyer monthly for the Labor Costs as the installation services are performed. All invoices from the Seller are due and payable by the Buyer thirty (30) days from the date of such invoice. If the quantity of Items actually required to complete the project increases or decreases from the quantities set forth on Schedule 1 hereto, Seller shall increase or decrease, as applicable, the Material Costs and Labor Costs invoiced to Buyer; in the event of such decrease, the Seller will

1/2055006.4

issue full credit (and refund) to Buyer for any materials previously invoiced (and paid) and returned to Seller in the same condition purchased. Seller may charge interest at the maximum rate permitted by law for all invoices not paid in full within thirty (30) days. No discount for early payment is authorized without Seller's written consent. Until all Items are paid in full, Seller shall retain a. purchase money security interest in all such Items.

4.  Delivery. Seller, in its discretion, may make and invoice partial shipments. Any shipping and related dates in this Agreement are estimates based on Seller's prompt receipt of all necessary information related to the Items.  Seller will provide the Items listed on Schedule 1 to Buyer beginning not later than thirty (30) days after the date of this Agreement.

5.  Installation. Seller shall subcontract the installation of the Items to a general contractor licensed in the State of Alabama ("Installer"). The Installer shall perform installation of the Items in accordance with the specifications set forth on Schedule 2 hereto.  Installer will begin work not later than ten (10) business days after the first Items are delivered and will proceed to complete installation of the Systems with commercially reasonable promptness but not later than six (6) months from the start date.

6.  Force Majeure. Seller shall not be responsible for any failure or delay in the performance of any obligation hereunder if such failure or delay is due to a cause beyond Seller's control including, without limitation, acts of God, wars, riots, strikes, fires, floods, shortages of labor or materials, labor disputes and governmental acts. In the event of any such failure or delay, the period of Seller's performance shall be extended, without liability for penalty, for the period of such failure or delay.

7.  Cancellation. This Agreement may be canceled only with the written consent of the Seller and upon return of the Items to Seller with all freight charges prepaid and payment of cancellation charges including, without limitation, Seller's direct costs: sales, general and administrative overhead; reasonable contract profits and any other costs and expenses to which Seller has or will become obligated to pursuant to this Agreement. Buyer may cancel upon failure to initiate or substantially complete installation of the Systems with "commercially reasonable promptness"; provided, however, that no such cancellation by Buyer shall be effective unless written notice of such failure has been given to Seller by Buyer specifying the failure and Buyer has not cured such failure within thirty (30) days after receipt of such notice.

8.  Limited Warranty. Meters included as a part of the Items are warranted by Master Meter, Inc. ("MMI") in accordance with MMI's standard warranty, a copy of which is attached hereto.  In addition, Seller warrants that the meters will operate free of defects for a period of one year from the date of original installation; Buyer  will notify Seller in writing during such one year period of any meter discovered to be defective and Seller will promptly remove the defective meter and install a replacement meter at no charge to Buyer.

**THE WARRANTIES, IF ANY, SET FORTH HEREIN, ARE IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, GUARANTEES OR REPRESENTATIONS, WHETHER EXPRESS , IMPLIED OR STATUTORY, INCLUDING, WITHOUT**

**LIMITATION, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SELLER NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PARTY TO ASSUME FOR SELLER ANY OTHER OBLIGATIONS OR LIABILITIES IN CONNECTION WITH THIS AGREEMENT.**

9. <u>Limitation of Liability</u>. Seller's aggregate liability on any claims for loss or liability arising out of or related this Agreement (including, without limitation, loss or liability arising from negligence, warranty, indemnity obligation, contract, strict liability or operation of law) shall in no case exceed the purchase price paid for the affected Items.

**IN NO EVENT SHALL SELLER BE LIABLE FOR OR OBLIGATED IN ANY MANNER TO PAY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS OR PRODUCTION, PLANT DOWN-TIME, LOSS OF USE OF PRODUCTIVE FACILITIES OR EQUIPMENT, PERSONAL INJURIES OR GOVERNMENTAL FINES OR PENALTIES, WHETHER SUFFERED BY BUYER OR A THIRD PARTY, EXCEPT PERSONAL INJURIES OR PROPERTY DAMAGES DUE TO INSTALLATION PROCEDURES.**

10. <u>Assignment</u>. Any assignment or attempted assignment by Buyer of this Agreement, in whole or in part, without the prior written consent of Seller shall be void. Seller may assign any of its rights, liabilities and obligations arising out of this Agreement only with Buyer's written consent which may not be unreasonably withheld.

11. <u>Governing Law and Forum</u>. This Agreement is made under and shall be governed in all respects by the laws of the State of Alabama, U.S.A. (excluding any conflicts of laws principles that would lead to the application of another state's laws). Buyer submits to the sole and exclusive jurisdiction of the state and federal courts of Alabama for the purposes of resolving any dispute arising under or in connection with this Agreement and irrevocably waives, to the fullest extent permitted by law, any objection which Buyer may now or hereafter have to any such proceedings. Seller and any subcontractor must have a valid City business license.

12. <u>Entire Agreement</u>. The headings in this Agreement are inserted for convenience only and shall not be used in the interpretation hereof. This Agreement may only be amended by a written document signed by Seller and Buyer. No waiver of any provision of this Agreement, or of a breach hereof, shall be effective unless it is in writing and signed by the waiving party. No waiver of a breach of this Agreement (whether express or implied) shall constitute a waiver of a subsequent breach. All provisions of this Agreement are severable, and the unenforceability or invalidity of any of them shall not affect the validity or enforceability of the remaining provisions of this Agreement. A nonbreaching party to this Agreement may recover reasonable attorney fees and expenses in enforcing or seeking damages from a breaching party. This Agreement constitutes the entire understanding between the parties and supersedes all previous understandings, agreements, communications and representations, whether written or oral, concerning the Items.

[Signature page follows.]

IN WITNESS WHEREOF, the undersigned parties have entered into this Agreement by and through their duly authorized officers or agents on or as of the date first above written.

**BUYER:**

CITY OF PHENIX CITY, ALABAMA

By: _____

Name: H.S. COULTER

Title: Mayor

ATTEST:

By: _____

Name: CHARLOTTE L. SIERRA

Title: City Clerk

By: _____

Name: WALLACE B. HUNTER

Title: City Manager

ATTEST:

By: _____

Name: CHARLOTTE L. SIERRA

Title: City Clerk

**SELLER:**

EMPIRE PIPE & SUPPLY COMPANY, INC.

By: _____

Name: CULLOM WALKER JR

Title: CHAIRMAN

1/2055006.4

2059568251

This warranty applies exclusively to Master Meter Multi-jet (MMMJ) 5/8", 3/4", 1", 1.5" and 2" meters purchased on or after January 1, 2006 when (120° F) and installed in accordance with Master Meter published installation instructions in effect as of the Master Meter shipment date of the ori applies exclusively to the original utility purchaser when product is purchased from either Master Meter or an authorized Master Meter distributor and registered usage is from date of shipment by Master Meter.

## Materials and Workmanship

If used and installed as described above, Master Meter warrants all MMMJ (5/8", 3/4", 1", 1.5", and 2") to be free from defects in material and wor (24 months) from date of shipment.

## Case Integrity

If used and installed as described above, Master Meter, Inc. warrants that the standard and/or low lead bronze cases of the 5/8", 3/4", 1", 1.5", an their structural integrity for a period of 25 years from the date of Master Meter shipment.

## Claims

Any meter or register covered by this warranty that fails to meet the terms of the stated warranty will be repaired or replaced, at the option of Mas responsible for removing the meter and/or register from service, returning it to the factory service center designated by Master Meter, Inc., providi the Return Material Authorization at the time of the returned product and for freight costs to the service center. The customer is also responsible f replaced product.

| Master Meter's MMMJ & BLMJ Multi-jets meet or exceed AWWA's most recent revision of C708 Standards for Accuracy. | 5/8" x 3/4" | 3/4" | 1" | 1.5" |
|---|---|---|---|---|
| New Meter Low Flow Accuracy | 97% @ ¼ GPM 5 Years or 750,000 USG | 97% @ ¼ GPM 5 Years or 750,000 USG | 97% @ ¾ GPM 5 Years or 1,100,000 USG | 97% @ 1.5 GPl 5 Years or 1,600,000 USG |
| New Meter Accuracy | 5 Years or 750,000 USG | 5 Years or 750,000 USG | 5 Years or 1,100,000 USG | 5 Years or 1,600,000 USG |
| Repaired Meter Accuracy | 15 Years or 2,500,000 USG | 15 Years or 2,500,000 USG | 15 Years or 3,250,000 USG | 15 Years or 5,800,000 USG |

**NEW - 5 Years     REPAIRED - 15 Years**

**= 20 Year Total Accuracy Guarantee**



V.030818

Jul 19 2010 3:13PM   EMPIRE#PIPE#

**Limits of Liability**

This warranty does not apply to meters or registers damaged by aggressive water conditions, foreign matter in water, vandalism, accordance with Master Meter, Inc. installation instructions, misapplication or other use not as described on this document, acts of God control of Master Meter, Inc. This warranty is null and void if a meter is altered by the addition of any register not manufactured by or on beh specific model and size. If a meter is claimed to breach the accuracy guarantees as stated herein, the customer shall submit a certified cop the meter is returned to Master Meter, Inc. This accuracy warranty shall be void if an examination of the customer's water system shows a metering equipment.

Any description of product, whether in writing or made orally by Master Meter, Inc or its agents, specifications, samples, literature, models, data sheets or similar materials used in connection with any customer's order are for the sole purpose of identifying product and shall not b implied warranty. Any suggestions by Master Meter, Inc. or its agents regarding use, application or suitability of product shall not be const warranty unless confirmed to be such in writing by Master Meter, Inc.

The laws of the State of Texas, excluding its conflicts of law rules shall exclusively govern this warranty. If any provision hereof, partly or co or unenforceable, such invalidity or unenforceability shall not affect any other provision or portion hereof and these terms shall be co unenforceable provision or portion thereof had never existed.

THE FOREGOING EXPRESS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES OR GUARANTEES WHATSOEVER OR IMPLIED (EXCEPT FOR WARRANTY OF TITLE) INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE.

CUSTOMER'S EXCLUSIVE REMEDY AND MASTER METER, INC. AND ITS BUSINESS PARTNERS' SOLE LIABILITY OI IN BIAS (INCLUDING STRICT LIABILITY), NEGLIGENCE, CONTRACT, WARRANTY OR OTHERWISE, FOR ANY METE FAILS TO MEET THE TERMS OF THE WARRANTY STATED IN THIS DOCUMENT, SHALL BE LIMITED TO REPAIR DESCRIBED ABOVE. IN NO EVENT SHALL MASTER METER, INC. AND/OR ITS BUSINESS PARTNERS BE LIABL CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO LOSS OF PROFITS OR REVENUE, I CAPITAL, COST OF SUBSTITUTE EQUIPMENT, FACILITIES OR SERVICE, DOWNTIME COSTS, DELAYS AND CLAIMS I CUSTOMER OR OTHER THIRD PARTIES.



MASTER METER

*Reading the Future*™

## UTILITY PRODUCTS PERFORMANCE WARRANTY

* Multi-jet Meters manufactured by Master Meter, Inc. are warranted to perform to AWWA new meter accuracy standards, and to be free from defects in materials and workmanship, for two (2) years from date of Master Meter shipment.

* Additionally, Master Meter Multi-jet Meters will perform to AWWA repaired meter accuracy standards for twenty (20) years from Master Meter shipment date or register limits indicated, whichever occurs first:

|  |  |  |
|---|---|---|
| 5/8" - 2.5 million gallons | 3/4" - 2.5 million gallons | 1" - 3.25 million gallons |
| 1-1/2" - 5.6 million gallons | 2" - 10.4 million gallons | |

* Master Meter 2" to 8" waterworks bronze body and 10" and 12" cast iron body MMT Turbine Meters are warranted to perform to AWWA accuracy standards and be free from material and workmanship defects for two (2) years from date of Master Meter shipment. Master Meter 2" to 8" cast iron body WT Turbine Meters and Fire Hydrant Meters are warranted to perform to AWWA accuracy standards and be free from material and workmanship defects for one (1) year from date of Master Meter shipment.

* Master Meter 2" to 6" DB Compound Meters are warranted to meet AWWA performance standards and be free from defects in material and workmanship for two (2) years from date of Master Meter shipment. Further, the Multi-jet installed for low flow measurement in the DB Compound Meter is covered by the Multi-jet performance warranty as described above.

* The waterworks bronze main cases for 5/8" to 2" Multi-jet Meters are warranted to be free from material and workmanship defects for twenty-five (25) years from the date of shipment by Master Meter.

* Direct read and DIALOG® System registers are warranted to be free from material defects and workmanship defects for fifteen (15) years from date of Master Meter shipment. Electrical Output and Rate of Flow registers are warranted to be free from material and workmanship defects for one (1) year from date of Master Meter shipment.

* DIALOG System Electronic Modules are warranted to be free from material and workmanship defects for ten (10) years from date of Master Meter shipment. All other DIALOG System components are warranted to be free from material and workmanship defects for one (1) year from the date of Master Meter shipment.

* All Master Meter products not specifically identified above are warranted to be free of defects in materials and workmanship for one (1) year from date of Master Meter shipment.

* If a product fails to perform as warranted, Master Meter will repair or replace the product, at Master Meter's option, at no charge to the customer, subject to the terms of the warranty.

* This warranty shall not be applicable to products that have been damaged by willful misconduct, negligence, vandalism, act of God, exposure to adverse service conditions or improper installation, use or repair.

* Master Meter's liability under this warranty is expressly limited to repair or replacement of the product, at Master Meter's option, upon the customer's return of the product to the factory or service center designated by Master Meter and paying freight cost to and from such factory or service center. The product replaced becomes the property of Master Meter. Master Meter shall not be liable for special, incidental, indirect or consequential damages of any kind.

THE ABOVE WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES OR GUARANTEES, EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO QUALITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.

**MASTER METER**

Master Meter, Inc.
101 Regency Parkway
Mansfield, Texas 76063

Warranty MM Utility 1/25/06

## DIALOG® 3G-DS Component Warranty

DIALOG 3G-DS registers and external transmitters (herein known as "product") are warranted to be free from defects in materials and workmanship for Ten (10) years from date of shipment by Master Meter and at a prorated replacement cost of list price during the following Ten (10) years based on the discounted rate value listing below.

All other 3G-DS System components are warranted to be free from defects in materials and workmanship for one (1) year from date of shipment by Master Meter.

If a product fails to perform as warranted, Master Meter will repair or replace the product at Master Meter's sole option, at no charge to the customer, subject to the terms of the warranty. This warranty shall not be applicable to products that have been damaged by willful misconduct, negligence, vandalism, act of God, exposure to adverse service conditions or improper installation, use or repair.

Master Meter's liability under this warranty is expressly limited to repair or replacement of the product, at Master Meter's option. The repaired or replacement product will maintain the original meter's warranty based on the original purchase date. The customer must pay for freight cost of the returned product or products to the factory or service center designated by Master Meter. The product replaced becomes the property of Master Meter.

Master Meter further warrants that any 3G register or external transmitter installed shall be free from battery defects in manufacturing and design for a period of ten (10) years from the date of shipment in the relevant DIALOG 3G-DS product (such period is defined as the "Battery Warranty Period"). Master Meter will repair or replace a product that is non-performing due to battery failure free of charge for the first Ten (10) years and at a prorated replacement cost based on the current list price during the remaining Ten (10) years as follows:

| Year of Failure | Replacement Cost |
|---|---|
| 1-10 | Full Replacement |
| 11 | 20% |
| 12 | 25% |
| 13 | 40% |
| 14 | 45% |
| 15 | 50% |
| 16 | 55% |
| 17 | 60% |
| 18 | 65% |
| 19 | 70% |
| 20 | 75% |



DISCOUNT PERCENTAGES WILL BE APPLIED AGAINST PUBLISHED LIST PRICES IN EFFECT AT THE TIME THE PRODUCT IS ACCEPTED BY MASTER METER UNDER WARRANTY CONDITIONS. THE WARRANTIES CONTAINED ABOVE HEREOF ARE THE ONLY WARRANTIES WITH RESPECT TO THE LISTED PRODUCTS, AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, BETWEEN THE PARTIES OR ARISING BY LAW. IN PARTICULAR, MASTER METER DISCLAIMS ANY AND ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THESE WARRANTIES SHALL BE VOID IN THE EVENT THAT THE FAILURE OR DEFECT IN THE LISTED PRODUCT HAS ARISEN AS A RESULT OF THE PRODUCT BEING USED FOR ANY PURPOSE OTHER THAN THAT WHICH WAS INTENDED AND APPROPRIATE AT THE TIME OF MANUFACTURE INCLUDING USE IN A CONFIGURATION OTHER THAN AS RECOMMENDED BY MASTER METER OR AS A RESULT OF IMPROPER INSTALLATION OR MAINTENANCE. MASTER METER'S LIABILITY SHALL IN NO EVENT EXCEED THE PURCHASE PRICE. MASTER METER SHALL NOT BE SUBJECT TO AND DISCLAIMS THE FOLLOWING: (1) ANY OTHER OBLIGATIONS OR LIABILITIES ARISING OUT OF BREACH OF CONTRACT OR OF WARRANTY (2) ANY OBLIGATIONS WHATSOEVER ARISING FROM TORT CLAIMS (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR ARISING UNDER OTHER THEORIES OF LAW WITH RESPECT TO PRODUCTS SOLD OR SERVICES RENDERED BY MASTER METER, OR ANY UNDERTAKINGS, ACT OR OMISSIONS RELATING THERETO, AND (3) ALL CONSEQUENTIAL, INCIDENTAL, SPECIAL, MULTIPLE, EXEMPLARY, AND PUNITIVE DAMAGES WHATSOEVER.

FORM MM1008 06/20/2005

**<u>Schedule 1</u>**

(see attached)

Subject:        AMR PROJECT - 4 % MATERIAL DISCOUNT FOR COMPLETE SHIPMENT      Date:

CITY COLLECTING GPS COORDINATES

RETROFITTING SPECIFIED 5/8" x 3/4" + RETROFITTING OF ADDITIONAL METERS

| Item | Quantity | Description | MATERIAL | LABOR | UNIT PRICE | T |
|------|----------|-------------|----------|-------|-----------|---|
| 1 | 13,007 | 5/8" x 3/4" BLMJ 3G DS Meter | $ 156.00 | $ 33.00 | $ 189.00 | $ 2 |
| 2 | 66 | 5/8" 3G DS Electronic  Register | $ 124.80 | $ 18.00 | $ 142.80 | $ |
|  |  | 5/8" x 3/4" Neptune Retrofit | $ 131.00 | $ 18.00 | $ 149.00 | $ |
| 3 | 768 | 1" BLMJ 3G DS Meter | $ 254.40 | $ 33.00 | $ 287.40 | $ |
| 4 | 37 | 1" 3G DS Electronic  Register | $ 148.80 | $ 18.00 | $ 166.80 | $ |
| 5 | 138 | 1 1/2" BLMJ 3G DS Meter | $ 408.00 | $ 198.00 | $ 606.00 | $ |
| 6 | 29 | 1 1/2" 3G DS Electronic  Register | $ 158.40 | $ 18.00 | $ 176.40 | $ |
| 7 | 163 | 2" BLMJ 3G DS Meter | $ 504.00 | $ 198.00 | $ 702.00 | $ |
| 8 | 31 | 2" 3G DS Electronic  Register | $ 158.40 | $ 18.00 | $ 176.40 | $ |
| 9 | 25 | 3" DBC Compound 3G DS Meter | $ 1,872.00 | $ 298.00 | $ 2,170.00 | $ |
| 10 | 20 | 3" DBC Retrofit Registers | $ 278.40 | $ 38.00 | $ 316.40 | $ |
| 11 | 20 | 4" DBC Compound 3G DS Meter | $ 2,448.00 | $ 398.00 | $ 2,846.00 | $ |
| 12 | 15 | 4" DBC Retrofit Registers | $ 278.40 | $ 38.00 | $ 316.40 | $ |
| 13 | 9 | 6" DBC Compound 3G DS Meter | $ 4,080.00 | $ 598.00 | $ 4,678.00 | $ |
| 14 | 9 | 6" DBC Compound Retrofit Registers | $ 278.40 | $ 38.00 | $ 316.40 | $ |
| 15 | 1 | 8" MMT Turbine 3G DS Meter | $ 3,648.00 | $ 798.00 | $ 4,446.00 | $ |
| 16 | 1 | 8" MMT Turbine Retrofit Registers | $ 139.20 | $ 38.00 | $ 177.20 | $ |
|  |  |  |  |  |  | |
| 17 | 1 | Software, Training, etc. | $ 14,400.00 | $ - | $ 14,400.00 | $ |
| 18 | 2 | Computer & Reading Equipment | $ 6,720.00 | $ - | $ 6,720.00 | $ |
|  |  | TOTAL PROJECT COST |  |  |  | $ 3, |

Subject: AMR PROJECT - 4 % MATERIAL DISCOUNT FOR COMPLETE SHIPMENT                    Date:

CITY COLLECTING GPS COORDINATES

RETROFITTING SPECIFIED 5/8" x 3/4" + RETROFITTING OF ADDITIONAL METERS

| Item | Quantity | Description | MATERIAL | LABOR | UNIT PRICE | T |
|------|----------|-------------|----------|-------|------------|---|
| 1 | 13,007 | 5/8" x 3/4" BLMJ 3G DS Meter | $ 156.00 | $ 33.00 | $ 189.00 | $ 2 |
| 2 | 66 | 5/8" 3G DS Electronic  Register | $ 124.80 | $ 18.00 | $ 142.80 | $ |
|   |   | 5/8" x 3/4" Neptune Retrofit | $ 131.00 | $ 18.00 | $ 149.00 | $ |
| 3 | 768 | 1" BLMJ 3G DS Meter | $ 254.40 | $ 33.00 | $ 287.40 | $ |
| 4 | 37 | 1" 3G DS Electronic  Register | $ 148.80 | $ 18.00 | $ 166.80 | $ |
| 5 | 138 | 1 1/2" BLMJ 3G DS Meter | $ 408.00 | $ 198.00 | $ 606.00 | $ |
| 6 | 29 | 1 1/2" 3G DS Electronic  Register | $ 158.40 | $ 18.00 | $ 176.40 | $ |
| 7 | 163 | 2" BLMJ 3G DS Meter | $ 504.00 | $ 198.00 | $ 702.00 | $ |
| 8 | 31 | 2" 3G DS Electronic  Register | $ 158.40 | $ 18.00 | $ 176.40 | $ |
| 9 | 25 | 3" DBC Compound 3G DS Meter | $ 1,872.00 | $ 298.00 | $ 2,170.00 | $ |
| 10 | 20 | 3" DBC Retrofit Registers | $ 278.40 | $ 38.00 | $ 316.40 | $ |
| 11 | 20 | 4" DBC Compound 3G DS Meter | $ 2,448.00 | $ 398.00 | $ 2,846.00 | $ |
| 12 | 15 | 4" DBC Retrofit Registers | $ 278.40 | $ 38.00 | $ 316.40 | $ |
| 13 | 9 | 6" DBC Compound 3G DS Meter | $ 4,080.00 | $ 598.00 | $ 4,678.00 | $ |
| 14 | 9 | 6" DBC Compound Retrofit Registers | $ 278.40 | $ 38.00 | $ 316.40 | $ |
| 15 | 1 | 8" MMT Turbine 3G DS Meter | $ 3,648.00 | $ 798.00 | $ 4,446.00 | $ |
| 16 | 1 | 8" MMT Turbine Retrofit Registers | $ 139.20 | $ 38.00 | $ 177.20 | $ |
|   |   |   |   |   |   |   |
| 17 | 1 | Software, Training, etc. | $ 14,400.00 | $ - | $ 14,400.00 | $ |
| 18 | 2 | Computer & Reading Equipment | $ 6,720.00 | $ - | $ 6,720.00 | $ |
|   |   | TOTAL PROJECT COST |   |   |   | $ 3, |
|   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |

## Schedule 2

WATER METER INSTALLATION SPECIFICATIONS

1. The Contractor shall install water meters on a route by route method as directed by the city.
2. The Contractor shall be responsible for repairing any leaks occurring 2' before and after the meter from broken water lines. If a service has an existing leak or a curb stop starts leaking from the exercise of the valve the city will be notified and the city will be responsible for repairing the leak.
3. The Contractor will provide the following meter changeout information to the city:
   a. Final read from old meter
   b. New meter serial number
   c. New meter EID number
   d. New meter reading
   e. Meter changeouts will be electronically transmitted to the city's utility billing software

4. The Contractor will leave the site free of debris, soil, grass, etc. after the meter changeout has been completed.
5. The Contractor will return all changed meters to the city at a site designated by the city on a daily basis.
6. The city will provide a list of customer services to define the meters to be changed.
7. The city will designate one employee as a contact person for the Contractor to communicate with.
8. A preconstruction meeting will be held to discuss any items not addressed in the specifications. (Special circumstances for customers, etc.)
9. The Contractor will provide a complete meter changeout audit of the system.